The next case today is Tim Karth v. Keryx Biopharmaceuticals, Inc. at all. Appeal number 191964. Attorney Block, please proceed. Thank you. Good afternoon, Your Honors. If it pleases the Court, Jeffrey Block for the plaintiff appellant, Tim Karth, and if I may, I'd like to reserve three minutes for rebuttal. You may. Thank you very much, Judge Thompson. Your Honors, we submit that the District Court erred in denying the plaintiff leave to amend to file the third amending complaint, finding it futile. And the District Court relied on two risk disclosures of the defendant, Keryx, one in February and one in April of 2016, in which Keryx disclosed that if any of their contract manufacturers, including their tablet supplier, Norwich Pharmaceuticals, were to limit their production, that it could affect their revenues. The District Court found that that adequately informed the market that there was a possibility or an impending supply interruption, so that when the stock price ultimately fell in early August 2016 by 36%, when the company revealed a supply interruption, that the market was informed and any misrepresentation that may have been made was cured by that risk disclosure. We submit that was error. First of all, as we pointed out in our reply briefing, we try to make it very clear, those risk disclosures are defendants' defense. We did not plead or allege that those are our false statements. So, the question is whether or not those risk disclosures are sufficient to absolve the defendants of liability. And as case law makes clear, and as we pointed out, for a risk disclosure to be adequate, it cannot just be a generic or boilerplate risk disclosure. And we submit, number one, these disclosures here were generic and were boilerplate. We cited to the court a number of risk disclosures from other pharmaceutical companies, a host of them, that are the same or very similar to what Carrick's disclosed here, that if our contract manufacturers don't supply our product, our revenues could be affected. In fact, that risk disclosure could apply to any company in any industry that relies on a third party to supply product. Counsel, let me ask you this, please. I mean, our case law suggests that if a disclosure of this kind might not be adequate, and this is a disclosure which acknowledges a risk of a single supplier, and if there was an And so that disclosure would not be enough if the company knows at the time of the disclosure to a near certainty, to a virtual certainty, that the risk identified will occur. It seems to be your position that there is material in that third amended complaint that meets that standard of near certainty, and that the district court, in analyzing that complaint, failed to appreciate that that standard was met. Can you tell us specifically what it is in that third amended complaint that meets what appears to be the applicable standard of near certainty of this identified risk coming to pass? So I'd like you to be very specific in telling us what is there in that complaint that the district court missed. Certainly, Your Honor. Thank you, Judge Lopez. I think you framed it perfectly. There are a number of facts that we specifically allege. First of all, the company itself sent a letter to the FDA just before the supply interruption in which they told the FDA the problems with our supply began in March, and in March we had a supply constraint, and we had been managing our supplies since March. That's fact number one. Number two, we also have an internal email in April of 2016 which says, if Norwich does not fix its problem, we will have a supply interruption in May. Number three, these were problems that Norwich had been having, and we put this in the complaint. It was, I think, repeated throughout the Thurman complaint. Norwich had been having production problems since before the company began its commercial production. Counsel, did any of these production problems ever prevent Norex from meeting its market demands? Did any of those problems identified with Norwich ever prevent them from continuing to meet the market demand for their product? Well, not until August of 2016 when they met the supply interruption, but certainly by April, we think by February, but clearly by April the company is well aware that they are on the precipice of a supply interruption. They are managing supply. They understand there are a lot of issues going on at Norwich, and the reason why I want to refer back to all the problems with Norwich is that this just doesn't come out in a vacuum. The company is aware that Norwich has been having problems since day one, so while Norwich is now having even more problems, it really should not have come as a surprise to the company that we're in trouble here, that we may not have enough product. What I'd also like to do is go back to, there was a board meeting in December of 2015 at which the company and management discussed the risks that were facing Norwich, and they specifically identified one of those risks as relying on one tablet supplier, Norwich. At the board meeting, they specifically said, there are two risks to us, loss of credibility with doctors and the risk of a supply interruption. The company understood that the problem with relying on Norwich was not just that Norwich wouldn't produce enough product to keep up with the demand of sales, but the company understood that the problem with Norwich was they may have a supply interruption, stop producing, and we will have no product, in which case it creates the problem that if there is a warning, not just to investors but to doctors, that we may not be able to produce this drug that your patients are relying on. A doctor now may be very reluctant to put his patient or her patient on that drug because now they're going to be worried, well, if they can't produce it now, I've got to go take them off and find something new. It would be a self-fulfilling prophecy for the company or a self-fulfilling problem that if we may not have enough supply, there may be a supply interruption, it could lead to a reluctance of doctors wanting to supply the product. Let me see if I can follow up on Judge Lopez's because I'm not sure I heard the specific pointing. As I understood it, your client purchased his shares on July 19 of 2016. Prior to that purchase, the company had disclosed that it had a single supplier and that if they were to limit or terminate production or otherwise fail to meet quality deliverance requirements, the company could suffer a loss of revenue. It had disclosed the fact, the single supplier, it had disclosed the generic risk. What was then the Grand Canyon that they knew about at that time that they were about to the two-week supply issue, but that was back in March and they continued well more than two weeks. There's about four minutes left. The risk disclosure that if one of our suppliers were to limit production itself wasn't a truthful disclosure because in fact at the time, Norwich was limiting production. The company was not really truthful with their investors. That predicate act of the risk was already occurring. What we have... Both would be true in which the general proposition that if someone limits, we've got a problem, that could be true. It could also be true that simultaneously one of them is limiting, but it's not affecting production. It was affecting production. I mean, not affecting sales. Right. Not affecting sales. Hadn't that been the history, counsel, that yes, Norwich had had these ongoing problems which were of concern to Carex. I think you could characterize it as a serious problem, but despite that history, Carex had never been put in the position of being unable to meet the demand for its product. So, given that history, why do they have to do more than acknowledge that there's still a problem and it could become very, you know, if Norwich were to limit or terminate production, that would be a big deal, but at that point, they did not perceive any certainty that that was going to happen. Well, what I'd like to do is refer to this court's decision in Tudor-Perini because we think it's a very similar case. In Tudor-Perini, it had to do with the collapse of the auction rate securities market, which collapsed in February of 2008, and BAS, Bank of America Securities, was recommending in 2007 for Tudor-Perini to buy auction rate securities and had made all the generic risk brokers may not support the market itself, and what happened was Tudor-Perini was buying throughout 2007, sold out, got back in 2008, and the case got dismissed on summary judgment and this court reversed, and one of the arguments Bank of America Securities made on appeal was we made all the adequate risk disclosures. We told Tudor-Perini, in fact, Tudor-Perini itself acknowledged that we knew there was this risk, and this court pointed to a number of facts throughout 2007 and into early 2008, which changed the risk profile, and I think one of the facts in particular I'd like to point to, which I think is sort of applicable here, is the court pointed to an internal email from Bank of America Securities in November of 2007, which said, we are one step away from liquidity. Now, the market didn't collapse until February of 2008, three months later. Here we have an internal email from April of 2016 saying, if Norwich doesn't fix its problem, we will have a supply interruption in May, and defendants conceded the point that there was an email acknowledging that, they conceded that below. That email was also three months before the actual supply interruption occurred, so the April changes. So, by the time the April 28 risk disclosure comes out, it's a different set of risks, and we think those facts… Excuse me, counsel, but hadn't historically Norwich, hadn't they always been able to correct the problem so that Carex was able to continue to meet the market demand? Wasn't that the history? Unfortunately, it changed, but at the time of the disclosure in April, that was the history, was it not? Well, the production problems into 2016 got worse. We allege no facts which say prior to 2016, at any point in time, that there was a possibility internally a warning of a supply interruption. That now occurs beginning in March and April of 2016, so internally the facts change, and that's why the risk profile internally now changes, but that's not what's revealed to investors. Any additional questions from my colleagues? Thank you, Counselor. Thank you, Your Honors. Thank you, Attorney Block. If you could mute your audio and video, and Attorney Schoen, please proceed. May it please the Court, Larry Schoen for the defendant, Apolise Carex, and its former officers. The District Court judgment should be affirmed for three independent reasons. First, Mr. Karth waived the argument that he makes here on appeal by not asserting it in the District Court below. Second, the District Court correctly concluded, consistent with this Court's precedent in Ciudar Perini and Hill, that the risk disclosure that Mr. Block just discussed and that was cited by the Court was sufficient because at the time the disclosure was made, the risk was still hypothetical because there had been, as Mr. Block admitted, no impact on patient supply, no revenue impact, and there's no basis upon which to conclude that there was a near certainty that that risk was going to materialize in the future. And third, even if the plaintiff could somehow overcome the fundamental problems of not being able to meet the Hill-Ciudar Perini standard and not being able to allege facts sufficient to meet the Grand Canyon standard requirement, there's still also a fundamental Scienter problem and there's been no allegations that are sufficient to meet that requirement, no direct evidence of admissions or warnings that the disclosures were inadequate, that anybody had concluded that, and no indirect evidence such as motive that would support a finding of Scienter. So for all of those reasons, the District Court judgment should be affirmed. I'd like to touch quickly first on the issue of waiver. In the conclusion to both their opening brief and their reply brief, the plaintiff remarkably asked this Court to declare the risk disclosures that were just talked about and cited by the District Court as misleading as a matter of law, even though they never made that argument below. Those risk disclosures are not cited in the 120-page proposed Third Amended Complaint and they never asked the District Court to find these specific disclosures misleading. Now, Mr. Block says, well, those are our defense. The problem with that is the PSLRA. The PSLRA says you have to allege in your complaint every disclosure that you allege to be misleading. So if their position was that this language in the February and April 2016 SEC disclosures was misleading and insufficient, they had an obligation to allege it, particularly where it relates to the same subject matter, allege manufacturing risk impacting revenues that are the subject of their complaint. Help me. Why is that so? It supposes a flat-out misstatement and the complaint alleges that flat-out misrepresentation. And then the defendant says, well, three months later, we issued this kind of general one that sort of talks about it and that cured it. Does the plaintiff automatically lose because they fail to also allege the alleged curative one even though they didn't think it cured it? Well, I think, Your Honor, the issue is yes, because their position isn't just that it's not curative. They're saying it's not curative because they're saying that statement is itself misleading. And the PSLRA says if you're alleging something is misleading, you have to disclose it. And this is their third bite at the apple, and they still don't allege it. Moreover, we specifically referenced it before they filed that proposed third amended complaint, their motion to amend. We had specifically referenced that language in our motion for judgment on the pleadings. And in opposition to their motion to amend, we specifically cited this language. And they still didn't come back and say, wait a minute, this language is misleading. So to have not raised it below and then to come in and ask this court to declare it misleading, we submit, is problematic and is a fundamental waiver. But going beyond that, the district court's decision was correct on the merits, and I think several members of the panel have already pointed out, I think, the fundamental problem here. Mr. Block admits that the risk of a patient supply interruption impacting revenues did not materialize until August of 2016. He tries, he admits the standard is that it had to be near certainty that that risk was going to materialize in the future. He tries to suggest that something happened in April that crossed the barrier into a near certainty, and we submit the record simply doesn't support that. If you look at the actual documents cited in the complaint, which are incorporated by reference. Well, wasn't Norwich unable to manufacture the higher dosage of the drug? And even though there was enough supply in the chain, that doesn't go to their inability to produce what was needed. No, well, Your Honor, there was no issue with them being unable to produce any dosage. There were two types of API, active pharmaceutical ingredient, that were used, that could be used to manufacture the drug. There was what was called large batch API and small batch API, which doesn't affect the dosage or the therapeutic effect of the medicine. It's simply the way of manufacture. So in March of 2016, when they had a problem with large batch API, they pivoted to using small batch API and continued and were producing and produced large volumes of product in April. There's this reference that they were down to two weeks supply. Well, during April, the inventory doubled. They were up to a month. They had every reason, as was referenced prior, to believe that any manufacturing issues in Norwich would be solved just as they always had been in the past because they had never impacted revenues. And there's no allegation here that there were internal forecasts coming to an opposite conclusion and saying, like you had in cable vision and other cases where there's fictitious sales or somebody saying, we've got one set of books that we're keeping internally and one that we're keeping externally. Here, all the evidence, all the documents cited in the complaint still say that they're projecting as of April 2016 that they're going to have enough product running through the end of 2016. And it's not until a new problem emerges in July, a different problem than had previously that had caused the issues in March and April that that changed. And as soon as that changed and then the company came to the conclusion that a patient supply interruption was imminent, it hadn't yet occurred. But once it came to the conclusion that it wasn't near certainty, it sent a letter to the FDA asking them to expedite approval of an alternate supplier. And the very next business day, August 1st, they disclosed that that impending supply interruption to the market. So it's only with the benefit of hindsight, which is impermissible as a matter of law, that anyone can suggest that something had changed in April. Mr. Block cites that July FDA letter saying, well, at that time, they acknowledged that some of the supply constraints that occurred in March and April started to reduce inventory. And that had an impact when the later problems emerged in July. But there's no allegation that anybody could have known that as of the April 28th, 2016 disclosure, which is the last disclosure that was made in the class period. In fact, Norwich was producing throughout April using small batch API. And it was only the day before that they reported an isolated issue on April 27th. And plaintiff misleadingly suggests in its brief that that was the middle of a five week supply interruption. It wasn't the middle, only with the benefit of hindsight. It's if somebody reports to you the day before you have an isolated issue, you have no way of knowing and there's no allegation that anybody in the company knew that that particular stoppage was going to last for five weeks. And moreover, even though that stoppage did last for five weeks, they still had enough product. They still overcame the issue. They restarted producing and they continued into June, into July. And it wasn't until July when a new problem arose. And there's no allegation, nor could there be, that anybody within the company knew or even should have known, which isn't the standard here, but even could or should have known as of April 2016 that this time was going to be different, that this problem was going to emerge in July, which was going to ultimately lead to this patient supply interruption. So you keep referring to a new problem. I thought there was a kind of, I'm not sure, was it a contamination problem? There was some perhaps cracking taking place in the material that was to be provided, which suggests that there was some kind of contamination problem. I thought that was the, there had been earlier instances of that. They tried to fix it and they disclosed that to Carex, but that problem then became not new, but larger and that's the problem that eventually prompted them to conclude they could not continue to supply the essential product. So that wasn't a new problem, was it? Well, to be clear, the problem with, there had been an isolated issue with cracking in April of 2015, which is referenced in paragraph 67 to 69 of the proposed third amended complaint, but it was referenced that there were a couple of batches that had that issue, but then there's no allegation in the complaint of that issue arising again until July of 2016 and nor which produced substantial volumes of product in the interim. So saying that you once had a cracking problem, it was dealt with, production stopped, restarted, they continued supplying, continued meeting patient demand. There's no allegation that as of April of 2016, when the last disclosure was made, that cracking issue was ongoing or that anybody knew that it was going to arise again in July and certainly doesn't meet the near certainty standard of Tudor Perini and of Hill. And I'd like to pivot then, Your Honor, to the Sienta argument, because even if the plaintiff could somehow meet the Hill test, which we submit they can't, they simply don't have enough allegations in the record to come anywhere close to meeting the standard necessary for Sienta. And essentially, this court has held that there's two ways that you can meet Sienta. The Boston Scientific Standard talks about you need to have admissions, confidential witness statements, things of that nature, showing either that the individual defendants not only had additional knowledge of material facts, but they knew that the decision not to disclose those facts was something that was misleading. And you need either warnings by subordinates saying, hey, our disclosures might be inadequate, shouldn't we be disclosing this, or somebody internally admitting that. They have, despite having received voluminous discovery in this document discovery in this case, they don't allege anything like that. And of course, under the PSLRA, you're not entitled to any discovery. They had the benefit of that because they had the prior operative complaint, but they still don't come forward with any of that. And the recent decision by this court in Yan talks very specifically about that. It's not enough to allege you knew some additional facts that you didn't disclose. You've got to be able to show that that disclosure was misleading, that you knew at the time you didn't disclose it, that failure to disclose it was going to be misleading to the market. And then Yan says the other way you can, if you don't have that direct evidence, is through motive evidence. If there were allegations of insider trades or that the company was in the middle of undergoing a financing so that it knew, all right, well, we know this information in April, but we're going to wait to disclose it because we want the financing to close or we want to get our stock bonus that's triggered on some particular date, then you might have something that would support the inference of Sciencer. But here, essentially their allegations make no sense. They're saying that as of April of 2016, the situation was so dire that everybody knew that there was going to be a patient supply interruption, even though there's nothing in the record to support that. But if that's the case, what incentive would management have not to disclose that? Because it would inevitably come to light. And on page 56 of their brief, the plaintiffs admit it really wasn't the case. They say, look, the executives knew that a supply interruption was possible, not that it was nearly certain, and they were trying to manage around the nor which problems. Well, that just confirms that they can't meet the Grand Canyon test. You don't manage around the Grand Canyon. If you know the Grand Canyon is there, you're falling into it. There's no way to manage around it. Why Tudor Perini is different. In Tudor Perini, the court found that there were documents showing that the defendants had come to the conclusion that the ARS market was going to fail, not that it was possibly going to fail. It was going to fail. And not only that, they were in the process of trying to unload their own ARS holdings. So that's the reason why they were doing it. They had an incentive, even though they knew it was going to fail, if they could keep the hope alive for another month, another few weeks, they could try to unload their auction rate security holdings at the expense of the plaintiff. There's no evidence at all, no allegations of that type of conduct here. And it's really very similar to Yan, what they're saying. In Yan, the company warned that there's a risk that we're going to be found in FDA noncompliance. And at the time they made that disclosure, they received an FDA warning letter saying you're not in compliance right now. And they didn't disclose that for five months. And the court still found no scienter because the company had made the general warning and the company still believed that it could overcome the issues that the FDA had identified in that warning letter. And so as a result, there was no obligation to disclose it. There was no evidence, no allegations that would support the notion that this was misleading as opposed to just information that they didn't think they had to disclose. And as the court said in Yan, at most, what happened here, at most, is that management might have been unreasonably optimistic. We submit they weren't unreasonably optimistic because Norwich had always overcome these issues in the past and there was no reason to believe at the time of April 2016 that this would be any different. But even if they were too optimistic, even if maybe different management would have come to a different conclusion, that is not securities fraud. And so for that reason as well, we submit that the district court's judgment should be affirmed either on waiver grounds, on the grounds that it was decided, or in the alternative on scienter grounds. Unless the court has any further questions, I'll rest on my briefs. Thank you, Counselor. Thank you. Thank you. If you could please mute your device, Attorney Schoen, and Attorney Block, you have three minutes of rebuttal. Thank you, Your Honors. Let me make a few points. First of all, I know Mr. Schoen has made a couple of arguments about there was nothing internally, nothing in April at all, suggesting to the contrary that there will be anything other than enough products. And in fact, what Mr. Schoen conceded below, and we cite this at page 16 of our opening brief, note 12, the concession was, the mid-April 2016 forecast suggested that a customer supplier interruption could occur in May 2016, if Norwich was unable to resolve the plastics issues. So there were internal documents clearly saying, if this problem that had been started back in March, which is what they admitted to the FDA, they said to the FDA, supply has been So if Norwich did not fix that problem, that had then been ongoing for over a month, there would be a supply interruption in May. That, we think, gets you to a near certainty. And a near certainty doesn't mean that, as Mr. Schoen is suggesting, the company has to say with 100% certainty, yes, there will be a supply interruption tomorrow, now we have to disclose. They know it's coming. They know there are problems. They know there are issues. So that risk disclosure that they put out, certainly at the end of April, wasn't truthful. I'd also like to circle back for a minute to, there was a statement in the year-end 2015 10-K that we point to in the third-amended complaint that the district court didn't consider, where the board said, we believe we have enough contract manufacturers to give us enough supply to meet commercial demand. However, at the board meeting a month and a half earlier, the court identified as a risk to Chemex having only one tablet supplier, Norwich. And the company made it a high priority to get another tablet supplier. And the company actually identified what was the risk, supply interruption. So the company was well aware that just relying on Norwich was a risk, it was a risk of a supply interruption. They knew it was, that having just Norwich wasn't enough. And that's a different disclosure than saying, we're only relying on one tablet supplier, than saying, we only have one tablet supplier, but we know we need to get another one. And the one that we have, even though we're telling you we think it's sufficient, it's not. So we think that creates what's false and misleading about this case. Just to circle back, you know, also my colleague argued, what incentive did they have to not reveal in April of 2016 this potential supply interruption? Well, the incentive was a couple. One, if you reveal that we may have a supply interruption, it leads to what I talked about earlier as doctors having their concerns saying, well, I don't know if I want to prescribe this product or this drug for my client because it may not be around. Two, what we also allege in the complaint, the company went out and did market research and understood that the market was taking a wait-and-see attitude, which is, we want to see sales. If we don't see sales, investors aren't interested. So disclosing a supply interruption, trying to conceal it and hope that we're going to fix the problem, gets you out of those issues. That's the motive. Thank you, Your Honors. Thank you. That concludes the arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the Court. God save the United States of America and this Honorable Court.